UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

——————————————————————————

PAMELA L. KEITH,

                              Plaintiff

                                                            DECISION AND ORDER

-vs-
                                                            07-CV-6198 CJS

MICHAEL J. ASTRUE,
Commissioner of Social Security,

                              Defendant.

——————————————————————————

APPEARANCES

For the Plaintiff:          John F. McKeown, Esq.
                            70 North Main Street
                            Canandaigua, New York 14424

For the Defendant:          Terrance P. Flynn, Esq.
                            United States Attorney for the
                            Western District of New York
                            John Field, Esq.
                            Assistant United States Attorney
                            100 State Street
                            Rochester, New York 14614

INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner"), which denied

plaintiff's application for disability insurance benefits.  Now before the Court is

Defendant's motion for judgment on the pleadings [#11] and Plaintiff's cross-motion

[#13] for the same relief.  For the reasons stated below, Defendant's application is

1

denied, Plaintiff's application is granted, and this matter is remanded for further administrative proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for disability benefits on or about January 5, 2004, claiming to be disabled due to "depression bipolar disorder." (47). [1]  On March 24, 2004, the Commissioner denied the application.  On July 14, 2005, a hearing was held before Administrative Law Judge Craig DeBernardis ("ALJ"), and on September 22, 2005, the ALJ issued a written decision denying Plaintiff's claim.  Plaintiff appealed, however, the Appeals Council declined to review the ALJ's determination. (3-6).  On April 18, 2007, Plaintiff commenced the instant action.  Defendant filed the subject motion for judgment on the pleadings on December 3, 2007, and Plaintiff filed the subject cross-motion on December 4, 2007.  On April 17, 2008, counsel for the parties appeared before the undersigned for oral argument of the motions.

## VOCATIONAL HISTORY

At the time of the hearing, Plaintiff was 47 years of age and was certified as a Licensed Practical Nurse ("LPN").  Plaintiff worked as an LPN between 1985 and 2003. (48).  Plaintiff claims that she became unable to work on June 30, 2003. (39).

## MEDICAL EVIDENCE

In February and March 2000, Plaintiff received in-patient hospital treatment for a depressive episode, which she attributed to the fact that her husband was seeking a divorce. (75).  On April 10, 2000, Plaintiff was evaluated at Clifton Springs Hospital by

---

[1]Unless otherwise noted, citations are to the administrative record.

Mahendra Nanavati, M.D. ("Nanavati"), a psychiatrist.  Nanavati's notes indicate that

Plaintiff was depressed about the impending divorce.  Nanavati reported that Plaintiff's

thoughts were organized, and that she expressed a full range of emotions.  However,

her mood was depressed, and she displayed poor memory, poor judgment, and poor

insight.  (75).  Her GAF score was 60. (76).  Nanavati's diagnosis was Bipolar I

Disorder, for which the prognosis was "good" with treatment, and he recommended

outpatient treatment with medication and supportive therapy. (*Id.*).  It is unclear to what

extent Plaintiff followed the recommendation that she receive supportive therapy,

although, the record indicates that she began taking Prozac in August 2002, and

Effexor in January 2003. (84).

On or about September 19, 2003, Plaintiff's primary care physician, Linda

Starck-McLean, M.D. ("Starck-McLean"), completed a report indicating that Plaintiff was

moderately limited in the following areas: Understanding and remembering instructions,

maintaining attention and concentration, and ability to function in a work setting at a

consistent pace. (109).[2]

On February 4, 2004, Plaintiff was examined by Christine Ransom, Ph.D.

("Ransom"), a consultative examiner.  Ransom noted that Plaintiff was taking Effexor.

Plaintiff told Ransom that her sleep was erratic, meaning that she either slept too much

or too little, and that she cried frequently, was irritable, and felt fatigued. (113-114).

Plaintiff further stated that she experienced anxiety when under the stress of a job

which required her to complete specific tasks according to specific instructions, and that

---

[2]It appears that additional pages of this report are missing.  Although the signature page is also missing, the handwriting clearly appears to match other reports written by Starck-McClean.

she had difficulty thinking at such times.  However, she denied generalized anxiety,
panic attacks, manic symptoms, thought disorder, cognitive symptoms or cognitive
deficits. (114).  Upon examination, Ransom found that Plaintiff was cooperative and
socially appropriate, with appropriate eye contact, and that her thought processes were
"coherent and goal directed with no evidence of hallucinations, delusions or paranoia."
(*Id.*).  Ransom also noted that Plaintiff's affect was "mild to moderately flat" (*Id.*); her
attention and concentration, as well as her recent and remote memory, were intact
(115); her cognitive functioning was average; and her insight and judgment were good.
(*Id.*).  Ransom's diagnosis was "major depressive disorder, currently mild to moderate,
anxiety disorder nos, currently mild." (116).  Ransom described Plaintiff's abilities as
follows:

> This individual can follow and understand simple directions and
> instructions, perform simple rote tasks, maintain attention and
> concentration for tasks, consistently perform simple tasks and learn
> simple new tasks.  She will have mild to moderate difficulty performing
> complex tasks and appropriately dealing with the normal stressors of the
> competitive work world due to major depressive disorder, currently mild to
> moderate.

(115).

On February 19, 2004, Starck-McLean completed a report, indicating that she
had been treating Plaintiff since 1996, and that she had last examined Plaintiff on
January 27, 2004.  Starck-McLean's diagnosis was "major depression." (82).  Starck-
McLean stated that Plaintiff's understanding and memory were limited due to "memory
problems," and that she was also limited with regard to sustained concentration and
persistence. (86).  Although it is somewhat difficult to read, Starck-McLean's report
further states: "Pt. [patient] has not had insurance - unable to obtain psychiatric care ."

(87).

On or about March 1, 2004, Plaintiff was approved to receive New York State Disability by the Wayne County Department of Social Services, "based on the MRFC[3] assessment which shows marked limitations in understanding and memory, sustaining concentration and persistence, social interaction, and adaptation.  Client is therefore, incapable of engaging in any substantial gainful activity. Information provided does not meet or equal a listing." (221).

On March 17, 2004, Carlos Gieseken, M.D. ("Gieseken"), an agency review physician, completed a Mental Residual Functional Capacity Assessment report. (111-112A).  Gieseken indicated that Plaintiff was moderately limited in the following areas: Understanding and remembering detailed instructions, carrying out detailed instructions, maintaining concentration and attention for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms, and responding appropriately to changes in the work setting. (111-111A). Gieseken noted that Plaintiff "had depressed mood, intact concentration, mildly decreased memory [and] flat affect," and he concluded that she "could do simple task work, but would have difficulty with complex work." (112).  Gieseken further stated that Plaintiff's statements appeared

> mostly credible, in that she does appear to have a degree of decreased functioning at times due to her mental problems. . . . The analyst concurs that she may have difficulty returning to this work [as a Licensed Practical Nurse] due to the complexity of the tasks and stress level.  The Claimant does retain the ability to do simple task work.  She can do other work, simple tasks. [sic]

---

[3]"MRFC" is the Mental Residucal Functional Capacity.

(112A).  The same day, Gieseken completed a Psychiatric Review Technique form, in

which he indicated that Plaintiff's impairments were "major depressive disorder,

currently mild to moderate," and "anxiety disorder nos, currently mild," which did not

satisfy the diagnostic criteria for Affective Disorder, 12.04, or Anxiety-Related Disorder,

12.06. (120, 122).  Gieseken stated that Plaintiff had a mild restriction of her activities of

daily living, mild difficulties maintaining social functioning, moderate difficulties

maintaining concentration, persistence, or pace, and one or two episodes of

deterioration. (127).

On April 25, 2004, Nanavati examined Plaintiff, who reported that she had being

taking Effexor for approximately one year as prescribed by her primary care physician,

but that the medicine was not helpful and made her sleepy. (154).  Plaintiff stated that

she had felt depressed since age 14. (*Id.*).  On May 3, 2004, Nanavati diagnosed

Plaintiff with "bipolar disorder depressed, dysthymic disorder depressed, chronic," and

admitted her to Clifton Springs Outpatient Mental Health Clinic for evaluation,

medication evaluation, and medication therapy. (161).  On or about June 1, 2004,

Nanavati examined Plaintiff and noted that she was alert, with intact memory, but was

depressed and had a flat affect. (189).  Plaintiff indicated that Effexor was "helpful," and

Nanavati prescribed Depakote, in addition to the Effexor. (*Id.*).  On August 20, 2004,

Nanavati examined Plaintiff, who indicated that she was experiencing "lots of confusion,

forgetfulness," and that the Depakote had "knocked her out."  Nanavati discontinued

Depakote.  Plaintiff reported feeling tired and "really really depressed." (192).  Nanavati

increased Plaintiff's prescription of Effexor, and urged her to be more compliant in

taking medication and in attending appointments. (193).  In that regard, on October 12,

2004, Nanavati noted:

> Patient's pattern of inconsistent attendance to both medication
> appointments and individual therapy appointments has impeded patient's
> progress in treatment.  Patient has experienced multiple stressors over
> the course of the most recent treatment period.  Plaintiff recently lost her
> job due to absenteeism, and moved out of the home she shared with her
> boyfriend and father of her youngest child.  Plaintiff reports ongoing
> symptoms of depression and anxiety.  Patient is currently prescribed
> Effexor. . . .  P[atient] requires ongoing treatment in order to stabilize
> symptoms.  Without treatment, the patient's symptoms exacerbate and
> the patient becomes more depressed, leading to a decreased level of
> functioning and increases the potential for hospitalization.

(174-175).

On November 9, 2004, Plaintiff was seen by Patricia Taylor, M.D. ("Taylor"), who

apparently was an associate of Nanavati.  Taylor reported that Plaintiff's thought

process was goal directed, that her thought content appropriate, and that her

intelligence, insight, judgment, and attention span were all within normal limits. (196).

Taylor indicated that Plaintiff's mood was within normal limits, and that her affect was

appropriate. (197).  Taylor recommended psychotherapy, and decreased Plaintiff's

Effexor prescription. (*Id.*).

On December 9, 2004, Plaintiff was examined by P. King, M.D. ("King") at the

Clifton Springs Clinic.  King reported that Plaintiff was feeling better with the decreased

dosage of Effexor, and that during the past three days, she had felt "normal," with

increased activity. (203). King also reported that Plaintiff's mood was depressed but

"improved," and her affect was appropriate. (204).

On February 15, 2005, Plaintiff was examined by Shana Clark, M.D. ("Clark"), at

the Clifton Springs Clinic.  Clark reported that the Effexor was making Plaintiff feel

"sleepy," and she decreased the Effexor dosage and started a prescription of

Wellbutrin. (205).

On May 19, 2005, Plaintiff was again examined by Nanavati, who reported that Plaintiff was complaining of tiredness and lack of motivation, as well as depression and decreased concentration. (260). Nanavati indicated that Plaintiff's mood was depressed and anxious, though her memory was intact. (261). In a report dated the same day, Nanavati noted that Plaintiff had greatly improved her compliance in taking medications and attending appointments, and that she was "actively involved" in treatment. (242). Nanavati also indicated that he was referring Plaintiff to Dr. Kent Osborn, Ph.D. ("Osborn") for psychological testing.

In a report dated May 11, 2005, Osborn indicated that he had evaluated Plaintiff using the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test. (223). Osborn indicated that, on the MMPI-2, Plaintiff "generated a significantly and naively defensive validity scale profile,"and that her

> [c]linical scale indicators reveal self-reported difficulties in terms of
> potential to deny or convert psychological conflicts into somatic equivalent
> of a moderately severe nature. There is somewhat lesser test evidence
> noted for difficulty with depression/dysphoria and bodily
> preoccupation/concern as well as potential to resort to acting-out behavior
> in the resolution of conflict or stress. . . . . Personality disorder diagnoses
> are commonly associated with this profile type, as is a diagnosis of
> depression.

(224). On February 1, 2006, Osborn conducted further testing, which showed that Plaintiff's language and verbal skills were within normal limits, and that she had "mild" neuropsychological deficits in the area of verbal memory. (317). Osborn summarized his findings by stating that, "Overall, I am at this point impressed with the likelihood that Ms. Keith's memory difficulties, when they occur, would most likely be the result of

interfering effects of anxiety and pressure as well as not paying close attention to the completion of tasks and so forth." (318).

On June 2, 2005, Nanavati completed a Mental Impairment Questionnaire, indicating, inter alia, that Plaintiff suffered from bipolar disorder, depression, and dysthymic disorder. (227).  Nanavati noted that Plaintiff was taking Wellbutrin and Effexor, and was reporting no side effects. (*Id*.).  As for signs and symptoms, Nanavati reported that Plaintiff was experiencing or had experienced anhedonia, appetite disturbance, decreased energy, feelings of guilt or worthlessness, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, bipolar syndrome, emotional lability, memory impairment, and sleep disturbance. (228). Nanavati stated that Plaintiff had marked limitations with regard to social functioning and concentration, persistence and pace, as well as moderate limitations with regard to activities of daily living. (229).  Nanavati further indicated that Plaintiff had experienced episodes of decompensation in June 2004, August 2004, and May 2005. (*Id*.).  On the pre-printed form report, Nanavati checked boxes, indicating that Plaintiff had a "medically documented history of a chronic organic mental schizophrenic, etc. or affective disorder of a at least 2 year's duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," as well as "[a] residual disease process that has resulted in such marginal adjustments that even a minimal increase in mental demands or change in the environment wold be predicted to cause the individual to decompensate." (230).  Nanavati stated that Plaintiff was markedly limited with regard to her ability to understand and remember short and simple instructions, as

well as detailed instructions, and was also markedly limited with regard to her ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday without interruption from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number of rest periods. (231).  Nanavati also stated that Plaintiff was moderately limited with regard to her ability to remember work procedures, carry out short and simple instructions, and interact appropriately with the public. (*Id.*).

On August 17, 2005, Nanavati reported that Plaintiff was complaining of decreased energy, motivation, and fatigue.  (248).  On August 22, 2005, Nanavati examined Plaintiff, who appeared depressed, "asocial," quiet, and withdrawn. (274). Nanavati reported that Plaintiff's mood was depressed and anxious. (275).  Plaintiff admitted that she was taking her medications irregularly. (275).  Nanavati changed Plaintiff's Wellbutrin dosage to make it easier for her to comply with taking her medication. (*Id.*).  On September 19, 2005, Nanavati examined Plaintiff, who indicated that she "sometimes" felt good and "sometimes not so good," and that counseling was helping. (282).  Plaintiff reported feeling sleepy during the daytime, and Nanavati decreased her prescription of Effexor. (282-283).  Nanavati noted that Plaintiff's mood was depressed and anxious. (283).

On November 6, 2005, Nanavati reported that Plaintiff had recently attended two "pharmacotherapy" appointments with him, and that she was complying with her medications.  (252).  However, Plaintiff was complaining of increased stress, anxiety, depression, fatigue, and difficulty managing her responsibilities. (*Id.*).  On November 30, 2005, Nanavati saw Plaintiff, and observed that her mood was depressed and anxious,

10

and her affect was depressed. (291-292).  Plaintiff reported feeling anxious, nervous, and socially aloof. (291).

On February 13, 2006, Plaintiff was seen by John C. Marino, M.D. ("Marino") at the Clifton Springs Clinic.  Plaintiff voiced "dismay at seeing Dr. N [apparently Nanavati] and many other Dr.s 'who never seem to listen." (302).  Plaintiff complained of "racing thoughts" and of a "memory problem." (*Id.*).  However, Marino observed that Plaintiff's mood was within normal limits, and that her affect was "giddy." (303).  Marino discontinued Plaintiff's Effexor prescription and increased her Wellbutrin prescription. (*Id.*).  On March 6, 2006, Marino again saw Plaintiff, and observed that her mood was within normal limits and that her affect was appropriate. (307).  On May 9, 2006, Marino again observed that Plaintiff's mood was within normal limits, and that her affect was appropriate. (315).

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in

11

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).  At step five of the five-step analysis above,

the Commissioner may carry her burden by resorting to the Medical Vocational

Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v.*

*Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting

that in the grids, "the only impairment-caused limitations considered in each rule are

exertional limitations.")  However, if a claimant has nonexertional impairments which

"significantly limit the range of work permitted by his exertional limitations," then the

Commissioner cannot rely upon the grids, and instead "must introduce the testimony of

a vocational expert (or other similar evidence) that jobs exist in the economy which

claimant can obtain or perform."[4] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. §

---

[4]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach,

416.969a(d).[5]

Under the regulations, a treating physician's opinion is entitled to controlling

weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-supported by medically acceptable
> clinical and laboratory diagnostic techniques and is not inconsistent with
> the other substantial evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 416.927(d)(2); 20 C.F.R. § 404.1527(d)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . .  that

opinion will not be deemed controlling.   And the less consistent that opinion is with the

record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d

Cir. 1999)(*citing* 20 C.F.R. § 404.1527(d)(4)).

Administrative Law Judges are required to evaluate a claimant's credibility

concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states

in relevant part:

> In determining whether you are disabled, we consider all your symptoms,
> including pain, and the extent to which your symptoms can reasonably be
> accepted as consistent with the objective medical evidence and other
> evidence.  By objective medical evidence, we mean medical signs and
> laboratory findings as defined in § 404.1528 (b) and (c). By other
> evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2)
> through (6) and 404.1513(b) (1), (4), and (5) and (e). These include

---

handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[5]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions
imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the
strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider
that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not
directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are
disabled based upon your strength limitations; otherwise the rule provides a framework to guide our
decision."

statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

*** 

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a).  The regulation further states, in pertinent part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

THE ALJ'S DECISION

At the first step of the five-step sequential analysis described above, the ALJ

found that Plaintiff had not engaged in substantial gainful employment "since her alleged

14

onset date." (15).  At the second step of the analysis, the ALJ found that Plaintiff had the

following severe impairment: "affective disorder." (16).  At the third step of the sequential

analysis, the ALJ found that Plaintiff's "severe impairment" did not meet or equal the

criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the

Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and

416.926). (13-14).

At the fourth step of the analysis, the ALJ made the following RFC determination:

> The claimant is unable to perform complicated tasks.  She can engage in
> only simple decision-making.  She requires a low stress work environment.
> She also requires a stable work environment in which there are no more
> than occasional changes in work settings, tools, procedures, etc.  The
> claimant has occasional ability to interact socially with co-workers,
> supervisors, and the public.  She has occasional lapses in concentration.

(16).  However, in making this finding, the ALJ rejected Nanavati's report dated June 2,

2005, which on its face, is Plaintiff's strongest piece of evidence.  In that regard, the ALJ

concluded that Kubrich essentially falsified the report, and that Kubrich signed it without

even reading it:

> In her indefatigable effort to help the claimant qualify for public assistance,
> Ms. Kubrich completed a mental impairment questionnaire for Dr.
> Nanavati's signature.  This is not a medical record but a recommendation
> of the claimant's application for disability benefits.  Dr. Nanavati obligingly
> signed it on June 2, 2005.  Ms. Kubrich also placed her signature on this
> document so that Dr. Nanavati would know the source of this information
> contained in the document.  The writing on the document is clearly that of
> Ms. Kubrich rather than Dr. Nanavati, as one can see from examining the
> treating notes of each of them.
>
> I have no confidence in the medical source statement signed by Dr.
> Nanavati.  In fact, he did not write it; he merely signed it at Ms. Kubrich's
> insistence.  Dr. Nanavati, as we have seen, only met with the claimant on
> two occasions.  On both of those occasions, Dr. Nanavati made no note of
> severe symptoms of mental disease in the claimant's case. . . .  One can
> imagine that Dr. Nanavati did not even bother to read the statements made

> by Ms. Kubrich before he affixed his signature to this document.  How else
> can one explain the inconsistency between this document and his
> treatment notes and those of Drs. Taylor, King and Clark?
>
> Mr. Kubrich is a social worker and not a psychiatrist of psychologist. . . . .
> No medical professional who examined the claimant or reviewed the
> medical evidence agrees with Ms. Kubrich's view of this case.

(19-20).  On the other hand, the ALJ credited the testimony of Dr. Richard B. Saul

("Saul"), a non-examining review psychiatrist, who testified at the hearing that Plaintiff

had only mild-to-moderate impairments. (*Id.*).  In that regard, the ALJ found that Saul's

opinion was the same as that of "every other medical professional" in the record besides

Nanavati. (*Id.*).  The ALJ also found that Plaintiff's testimony concerning her symptoms

was not credible, based largely on the fact that Plaintiff admitted lying about having

suicidal ideation on two occasions. (*Id.*).

Based on his residual functional capacity finding, the ALJ concluded that Plaintiff

could not perform her past relevant work as an LPN.  However, at the fifth step of the

five-step analysis, the ALJ found, based upon hypothetical questions that he posed to a

vocational expert ("VE"), that Plaintiff could perform other work, namely, fast food worker

and cafeteria attendant. (21).  Consequently, the ALJ found that Plaintiff was not entitled

to disability benefits.

ANALYSIS

In this action, Plaintiff claims that the ALJ erred in several respects.  First, Plaintiff

alleges that the ALJ failed to properly weigh the medical evidence in accordance with the

Commissioner's regulations.  Specifically, she maintains that in rejecting Nanavati's

opinions, and especially his report dated June 2, 2005, the ALJ failed to apply the

treating physician rule.  Additionally, Plaintiff argues that the ALJ failed to give proper

weight to the notes of Kubrich, who, she maintains, qualifies as a "medical source" under 20 C.F.R. § 404.1513(d)(1), and whose observations, she asserts, should be given considerable weight, given the fact that she treated Plaintiff for an extended period of time.  Plaintiff further contends that if the ALJ had properly applied the treating physician rule, he would have concluded that she has two impairments, affective disorder (Listing 12.04) and organic mental disorder (Listing 12.02(c)), that are sufficiently severe to qualify as "listed impairments," meaning that they meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). Additionally, Plaintiff contends that the ALJ failed to evaluate her credibility as required by 20 C.F.R. § 416.929 and Social Security Ruling ("SSR") 96-7P.  Finally, Plaintiff maintains that the case should be remanded solely for the calculation of benefits, since the record "contains persuasive proof of disability," and since the case has been pending since 2004.

The Court agrees that the ALJ committed errors of law that require a remand.  In that regard, the Court agrees that the ALJ failed to properly evaluate the medical evidence, most notably with regard to his rejection of Nanavati's opinions.  It was improper for the ALJ to discount office notes and reports signed by Nanavati as being merely the opinions of Kubrich. *See, Santiago v. Barnhart*, 441 F.Supp.2d 620, 628 (S.D.N.Y. 2006) ("For example, the ALJ completely disregarded Nunez's opinion that Santiago's depression met the B Criteria on the ground that Nunez expressed his view by signing a report that the ALJ believes was written by Malinowska.  However, even if the ALJ's handwriting analysis is accurate and the report was written by Malinowska,

17

there is no reason to believe that the report Nunez signed does not reflect his own view. Nor is there any legal principle which states that a doctor must personally write out a report that he signs for it to be afforded weight.  Since Nunez signed his name to the report and there is no evidence indicating that the report does not represent his opinion, the ALJ erred in discounting Nunez's opinion on this basis alone.") (citations omitted). Moreover, Defendant is incorrect in asserting that "Dr. Nanavati's role in [Plaintiff's] treatment was confined essentially to approving medication," and that "the medical record shows only two occasions when [Plaintiff] personally met with Dr. Nanavati." (Def. Memo of Law at 8).  As discussed above, Nanavati met with Plaintiff on numerous occasions, at which times he generally completed an assessment form, which included assessments of Plaintiff's mood and affect.  Accordingly, on remand the ALJ should evaluate Nanavati's notes and reports, including any notes by Kubrich which Nanavati co-signed, in accordance with the treating physician rule.  Additionally, to the extent that the record may contain notes by Kubrich which Nanavati did not co-sign,  the ALJ should evaluate them in accordance with  20 C.F.R. § 404.1513.  And finally, the ALJ should evaluate Plaintiff's credibility using the factors set forth in 20 C.F.R. § 416.929 and SSR 96-7P.

Although Plaintiff maintains that the case should be remanded solely for the calculation of benefits, the Court disagrees, since it does not appear that the evidence in this case could lead to only one conclusion on remand. *See, Schaal v. Apfel*, 134 F.3d at 504 ("Where application of the correct legal standard could lead to only one conclusion, we need not remand.  However, on this record, we cannot say with certainty what weight should be assigned . . . to the opinion of plaintiff's treating physician, or whether further

18

clarification of the record with these regulations in mind might alter the weighing of the evidence.  It is for the SSA, and not this court, to weigh the conflicting evidence in the record.") (citation omitted).  Consequently, the case must be remanded for a new hearing, during which it will be for the ALJ to determine whether Plaintiff's impairments are sufficiently severe to qualify as "listed impairments."

CONCLUSION

For the reasons discussed above, defendant's application [# 11] is denied, plaintiff's application [#13] is granted, and this matter is remanded for further administrative proceedings consistent with this Decision and Order, pursuant to 42 U.S.C. § 405(g), sentence four.  Additionally, because of the ALJ's seemingly strong antipathy toward Nanavati and Kubrich, on remand the Commissioner shall reassign the case to another ALJ.

So Ordered.

Dated: Rochester, New York
       April 28, 2008

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge

19